## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

------------------------------------

| | | | |
|---|---|---|---|
| MOLLY CORNELL | | : | CIVIL ACTION NO.: |
| | Plaintiff, | : | |
| v. | | : | JURY TRIAL DEMANDED |
| MONSANTO COMPANY | | : | |
| | Defendant. | : | |

------------------------------------

### COMPLAINT

The plaintiff, Molly Cornell, by and through their undersigned counsel, for their

Complaint against defendant Monsanto Company, states:

### **INTRODUCTION**

1. This action seeks to recover damages for the injuries sustained by the plaintiff as the
   direct and proximate result of the wrongful conduct and negligence of the defendant in
   connection with the design, development, manufacture, testing, packaging, promoting,
   marketing, advertising, distributing, labeling and selling of the herbicide Roundup,
   containing the active ingredient glyphosate.

2. Plaintiff maintains that Roundup and/or glyphosate is defective, dangerous to human
   health, unfit and unsuitable to be marketed and sold in commerce and lacked proper
   warnings and directions as to the dangers associated with its use.

3. Plaintiff's injuries, like those striking thousands of similarly situated victims across the
   country, were foreseeable and avoidable.

1

## JURISDICTION AND VENUE

4. This Court has jurisdiction on the defendant pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between plaintiff and defendant. Defendant is either incorporated and/or has their principal place of business outside of the state in which the plaintiff resides.

5. The amount in controversy exceeds $75,000.00 exclusive of interests and costs.

6. There is complete diversity of citizenship between plaintiff and defendant. Plaintiff is a resident and citizen of Madison, Connecticut. As set forth more fully below, the defendant is an entity organized in states other than the state of Connecticut, defendant's principal place of business is in a state other than the State of Connecticut, and defendant is not a citizen or resident of the State of Connecticut.

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a), because the defendants marketed, advertised, and distributed the dangerous product in this District; the plaintiff resides in this District; the plaintiff's harms, losses, and damages occurred in this District the defendants do substantial business in the State of Connecticut and within this District; and at all times relevant hereto, the defendants developed, manufactured, promoted, markets, distributed, warranted, and sold Roundup in interstate commerce.

## PARTIES

8. The plaintiff, Molly Cornell, is a citizen and resident of Madison, Connecticut.

9. The plaintiff brings this action for personal injuries sustained by the plaintiff's exposure to Roundup ("Roundup") which contains the active ingredient glyphosate and the surfactant polyethoxylated tallow amine ("POEA"). As a direct and proximate result of

2

being exposed to Roundup, the plaintiff has been diagnosed with Non-Hodgkins Lymphoma.

10. At all times relevant herein, "Roundup" refers to all formulations of the defendant's roundup products that contain the active ingredient glyphosate.

11. The defendant MONSANTO COMPANY is a Delaware corporation, in "active" status, with a principal place of business in St. Louis, Missouri.

12. The defendant advertising and sells goods, specifically Roundup, in New Haven County, Connecticut.

13. The defendant transacted and conducted business within the State of Connecticut that relates to the allegations in the Complaint.

14. The defendant derived substantial revenue from goods and products used in the State of Connecticut.

15. The defendant expected or should have expected their acts to have consequences within the State of Connecticut, and derived substantial revenue from interstate commerce.

16. The defendant engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup.  The defendant is authorized to do business in Connecticut and derives substantial income from doing business in this state.

17. Upon information and belief, the defendant purposefully availed themselves of the privilege of conducting activities with the State of Connecticut, thus invoking the benefits and protections of its laws.

3

18. Upon information and belief, the defendant did design, sell, advertise, manufacture and/or distribute Roundup, with full knowledge of its dangerous and defective nature.

**ALLEGATIONS OF FACT**

19. At all relevant times, the defendant did design, sell, advertise, promote, market, sell, distribute, and/or have acquired and is responsible for the defendants who have designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed the commercial herbicide Roundup.

20. Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri.  It is the world's leading producer of glyphosate.

21. The defendant discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate based "Roundup" as a broad spectrum herbicide.

22. Glyphosate is the active ingredient in Roundup.

23. Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

24. Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikmic acid-3-phosphate synthase, known as EPSP synthase.

25. Glyphosate inhibits the enzyme 5-enolpryruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

4

26. Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems and roots, and detectable quantities accumulate in the plant tissues.

27. Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses.  This increase in use has been driven largely by the proliferation of genetically engineered crops, which has allowed for the development of crops specifically tailored to resist the activity of glyphosate.

28. The defendant is intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup i.e., "Roundup Ready."  As of 2009, the defendant was the world's leading producer of seeds designed to be Roundup Ready. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup Ready seeds.

29. The original Roundup, containing the active ingredient glyphosate, was introduced in 1974.  Today, glyphosate products are among the world's most widely used herbicides.

30. For nearly 40 years, consumers, farmers, and the public have used Roundup, unaware of it's carcinogenic properties

**REGISTRATION OF HERBICIDES UNDER FEDERAL LAW**

31. The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIRFA"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the

Environmental Protection Agency ("EPA") prior to their distribution, sale, or sue, except as described by FIFRA 7 U.S.C. 136a(a)

32. The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

33. FIFRA defines "unreasonable adverse effects on the environment" to mean " any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted to allowed to continue to be sold in commerce.

34. The EPA and the State of Connecticut registered Roundup for distribution, sale, and manufacture in the United States and the State of Connecticut.

35. FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

36. The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a

pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

37. In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment – in relation to the registration process – no later than July 2015. The EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment pending further review in light of the World Health Organizations March 24, 2015 finding that glyphosate is a "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

## MONSANTO'S FALSE REPRESENTATIONS REGARDING THE SAFETY OF ROUNDUP

38. In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

a.  Remember that environmentally friendly Roundup herbicide is biodegradable.  It
won't build up in the soil so you can use Roundup with confidence along
customers' driveways, sidewalks and fences.

b.  And remember that Roundup is biodegradable and won't build up in the soil.
That will give you the environmental confidence you need to use Roundup
everywhere you've got a weed, brush, edging or trimming problem.

c.  Roundup biodegrades into naturally occurring elements.

d.  Remember that versatile Roundup herbicide stays where you put it.  That means
there's no washing or leaching to harm customers' shrubs or other desired
vegitation.

e.  This non-residual herbicide will not wash or leach in the soil. It … stays where
you apply it.

f.  You can apply Roundup with "confidence because it will stay where you put it"
and it bonds tightly to soil particles, preventing leaching.  Then, soon after
application, soil microorganisms biodegrade Roundup into natural products.
Glyphosate is less toxic to rats than table salt following acute oral ingestion.

g.  Glyphosate's safety margin is much greater than required.  It has over a 1,000 fold
safety margin in food and over a 700 – fold safety margin for workers who
manufacture it or use it.

h.  You can feel good about using herbicides by Monsanto. They carry a toxicity
category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

8

i. "Roundup can be used where kids and pets will play and breaks down in natural

material." This ad depicts a person with his head in the ground and a pet dog

standing in an area which has been treated with Roundup[1].

39. On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with

NYAG, in which Monsanto agreed, among other things, "to cease and desist from

publishing or broadcasting any advertisements [in New York] that represent, directly or

by implication" that:

a. its glyphosate-containing pesticide products or any component thereof are safe,

non-toxic, harmless or free from risk.

b. its glyphosate-containing pesticide products or any component thereof

manufactured, formulated, distributed or sold by Monsanto are biodegradable.

c. its glyphosate-containing pesticide products or any component thereof stay where

they are applied under all circumstances and will not move through the

environment by any means.

d. its glyphosate-containing pesticide products or any component thereof are "good"

for the environment or are "known for their environmental characteristics."

e. glyphosate-containing pesticide products or any component thereof are safer or

less toxic than common consumer products other than herbicides.

---

[1] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant of Executive Law § 63(15) (Nov. 1996).

      f.   its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

40. Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief has not done so today.

41. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup.  The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that "it left the soil clean." [2]

## EVIDENCE OF CARCINOGENICITY IN ROUNDUP

42. As early as the 1980's Monsanto was aware of glyphosate's carcinogenic properties.

43. On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[3] Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

44. In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87- 103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.[4]

_____

[2] Monsanto Guilty in 'False Ad' Row, BBC Oct. 15, 2009 available at http://news.bbc.co.uk/2/hi/europe/8308903.stm.

[3] Consensus Review of Glyphosate, Casewell No. 661A, March 4, 1985. United States Environmental Protection Agency.

[4] http://www.epa.gov/oppsrrd1/reregistration/REDs/factsheets/0178fact.pdf

45. In October 1991 the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.[5]

46. In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendants' Roundup products are more dangerous and toxic than glyphosate alone.[6] As early as 1991 evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.[7]

47. In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

48. The study found that Defendant's Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles

49. In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

---

[5] Second Peer Review of Glyphosate, CAS No. 1071-83-6. October 30, 1881. United States Environmental Protection Agency.

[6] Martinez et al. 2007; Benachour 2009; Gaspier et al; Peixoto 2005; Marc 2004.

[7] Martinez et al 1991.

11

50. The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cells, it was of interest to evaluate the threshold dose of glyphosate affecting cells."

51. In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

52. The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

53. In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

54. The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

55. The results of these studies were confirmed in recently published peer- reviewed studies and were at all times available and/or known to Defendants.

56. Defendant knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup.

57. Defendant knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

58. Defendant failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup.

59. Rather than performing appropriate tests, Defendant relied upon flawed industry-supported studies designed to protect Defendants' economic interests rather than Plaintiff and the consuming public.

60. Despite their knowledge that Roundup was considerably more dangerous than glyphosate alone, Defendants continued to promote Roundup as safe.

## IARC CLASSIFICATION OF GLYPHOSATE

61. The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency for the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

62. An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015–2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must

already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

63. IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer- reviewed data.

64. The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a class 2A probable carcinogen to humans. According to the authors, glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

65. The IARC Working Group found an increased risk between exposure to glyphosate and Non-Hodgkin's Lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

66. The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

**EARLIER EVIDENCE OF GLYPHOSATE'S DANGER**

67. Despite the new classification by the IARC, Defendant had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

68. Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

69. In 1997, Chris Clements published "Genotoxicity of select herbicides in Rana Catesbeiana Tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

70. The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

71. Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.

72. Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

73. The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

74. In 2006 César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

75. The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

76. The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate- based formulations is strong."

77. Despite knowledge to the contrary, Defendants maintain that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

78. In addition to glyphosate and Roundup's genotoxic properties, Defendants have long been aware of glyphosate's carcinogenic properties.

79. Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, Chronic Lymphocytic Leukemia, multiple myeloma, and soft tissue sarcoma.

80. Defendant has known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

81. In 1985 the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

82. In 2003 Lennart Hardell and Mikael Eriksson published the results of two case-controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

83. The study concluded that glyphosate had the most significant relationship to NHL among all herbicide studies with an increased odds ratio of 3.11.

84. In 2003 AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

85. The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

86. In 2008 Mikael Eriksson published a population-based case-control study of exposure to various pesticides as a risk factor for NHL.

87. This strengthened previous associations between glyphosate and NHL.

88. In spite of this knowledge, Defendant continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

89. Upon information and belief, these statements and representations have been made with the intent of inducing Plaintiff, the agricultural community, and the public at large to purchase and increase the use of Defendant's Roundup for Defendant's pecuniary gain, and in fact, did induce Plaintiff and her immediate family to regularly use Roundup.

90. Defendant made these statements with complete disregard and reckless indifference to the safety of Plaintiff and the general public.

91. Notwithstanding Defendant's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

92. Defendant knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

93. Defendant failed to appropriately and adequately inform and warn Plaintiff of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

94. Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Defendant continues to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non- genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

95. Defendant has claimed and continues to claim that Roundup is safe, non- carcinogenic, and non-genotoxic. These misrepresentations are consistent with Defendant's cavalier approach to investigating and ensuring the safety of their products, the safety of the public at large, and the safety of Plaintiff.

## SCIENTIFIC FRAUD UNDERLYING THE SAFETY DETERMINATION OF GLYPHOSATE

96. After the EPA's 1985 classification of glyphosate as possibly carcinogenic to humans (Group C), Monsanto exerted pressure upon the EPA to change its classification.

97. This culminated in the EPA's reclassification of glyphosate to Group E, which was based upon evidence of non-carcinogenicity in humans.

98. In so classifying, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

99. On two occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup products for registration purposes committed scientific fraud.

100.    In the first instance, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup. IBT performed approximately 30 tests on glyphosate and glyphosate-containing products, including 11 of the 19 chronic toxicology studies needed to register Roundup with the EPA.

101.    In 1976, the Food and Drug Administration ("FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to toxicological impacts of glyphosate. The EPA subsequently audited IBT and determined that the toxicology studies conducted for Roundup were invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

102.    Three top executives of IBT were convicted of fraud in 1983.

103.    In the second incident, Monsanto hired Craven Laboratories ("Craven") in 1990 to perform pesticide and herbicide studies, including several studies on Roundup.

104.    In March of 1991, the EPA announced that it was investigating Craven for "allegedly falsifying test data used by chemical firms to win EPA approval of pesticides."

105.     The investigation led to the indictments of the laboratory owner and a handful of

employees.

## MONSANTO'S CONTINUING DISREGARD FOR THE SAFETY OF THE PLAINTIFF AND THE PUBLIC

106.     Monsanto claims on its website that "[r]egulatory authorities and independent

experts around the world have reviewed numerous long- term/carcinogenicity and

genotoxicity studies and agree that there is no evidence that glyphosate, the active

ingredient in Roundup brand herbicides and other glyphosate- based herbicides, causes

cancer, even at very high doses, and that it is not genotoxic."

107.     Ironically, the primary source for this statement is a 1986 report by the WHO, the

same organization that now considers glyphosate to be a probable carcinogen.

108.     Glyphosate, and Defendant's Roundup products in particular, have long been

associated with serious side effects and many regulatory agencies around the globe have

banned or are currently banning the use of glyphosate herbicide products.

109.     Defendant's statements proclaiming the safety of Roundup and disregarding its

dangers misled Plaintiff.

110.     Despite Defendant's knowledge that Roundup was associated with an elevated

risk of developing cancer, Defendant's promotional campaigns focused on Roundup's

purported "safety profile."

111.     Defendant's failure to adequately warn Plaintiff resulted in (1) Plaintiff using and

being exposed to glyphosate instead of using another acceptable and safe method of

controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn

and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup.

112.     Defendant failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

113.     The failure of Defendant to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

114.     The failure of Defendant to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

115.     The failure of Defendant to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

116.     By reason of the foregoing acts and omissions, Plaintiff seeks compensatory damages as a result of Plaintiff's use of, and exposure to, Roundup which caused or was a substantial contributing factor in causing Plaintiff to suffer from cancer, specifically Non-Hodgkin's Lymphoma, and Plaintiff suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

117.     By reason of the foregoing, Plaintiff was severely and permanently injured.

118.     By reason of the foregoing acts and omissions, Plaintiff endured and, in some categories continues to suffer, emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of the actions and inactions of the Defendants.

## PLAINTIFF'S EXPOSURE TO ROUNDUP

119.     Plaintiff was first exposed to Roundup in 1998 on a monthly basis and in the course of maintaining her residence, until approximately July of 2020.

120.     Between approximately 1998 through July of 2020, Plaintiff and her husband sprayed Roundup for general up-keep of their property located at 5 Middle Beach Road, Madison, CT, which included a 1,400 square foot cobblestone driveway and a 400 square foot slate stone patio that necessitated consistent weed mitigation measures.

121.     Plaintiff followed all safety and precautionary warnings during the course of use.

122.     Plaintiff was subsequently diagnosed with Non-Hodgkin's Lymphoma in June of 2020. The development of Plaintiff's Non-Hodgkin's Lymphoma was proximately and actually caused by exposure to Defendant's Roundup products.

123.     As a result of her injury, Plaintiff incurred significant economic and non-economic damages.

## EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

124.     Plaintiff incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

125.     The running of any statute of limitations has been tolled by reason of Defendant's fraudulent concealment. Defendant, through their affirmative misrepresentations and omissions, actively concealed from Plaintiff the true risks associated with Roundup and glyphosate.

126.     At all relevant times, Defendant has maintained that Roundup is safe, non- toxic, and non-carcinogenic.

127.     Indeed, even through July of 2020, Defendant continues to represent to the public that "Regulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup® brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic" (emphasis added).

128.     As a result of Defendant's actions, Plaintiff was unaware, and could not reasonably know or have learned through reasonable diligence that Roundup and/or glyphosate contact, exposed Plaintiff to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions

129.     Furthermore, Defendant is estopped from relying on any statute of limitations because of their fraudulent concealment of the true character, quality and nature of Roundup. Defendant was under a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which Defendant had and continue to have exclusive control, and because Defendant knew that this information was not available to Plaintiff or to distributors of Roundup. In addition, Defendant is estopped from relying on any statute of limitations because of their intentional concealment of these facts.

130.     Plaintiff had no knowledge that Defendant was engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendant, Plaintiff could not have reasonably discovered the wrongdoing at any time

prior. Also, the economics of this fraud should be considered. Defendant had the ability

to and did spend enormous amounts of money in furtherance of their purpose of

marketing, promoting and/or distributing a profitable herbicide, notwithstanding the

known or reasonably known risks. The Plaintiff and medical professionals could not have

afforded and could not have possibly conducted studies to determine the nature, extent,

and identity of related health risks, and were forced to rely on only the Defendant's

representations. Accordingly, Defendant is precluded by the discovery rule and/or the

doctrine of fraudulent concealment from relying upon any statute of limitations.


## NEGLIGENCE

131.     Plaintiff repeats, reiterates, and re-alleges each and every allegation of this

Complaint contained in each of the foregoing paragraphs inclusive, with the same force

and effect as if more fully set forth herein.

132.     Defendant had a duty to exercise reasonable care in the designing, researching,

testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or

distribution of Roundup into the stream of commerce, including a duty to assure that the

product would not cause users to suffer unreasonable, dangerous side effects.

133.     Defendant failed to exercise ordinary care in the designing, researching, testing,

manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality

assurance, quality control, and/or distribution of Roundup into interstate commerce that

Defendant knew or should have known that using Roundup created a high risk of

unreasonable, dangerous side effects, including, but not limited to, the development of NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

134.     The negligence by the defendant, their agents, servants, and/or employees, included but was not limited to the following acts and/or omission:

   a)  Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup without thoroughly testing it;

   b)  Failing to test Roundup and/or failing to adequately, sufficiently, and properly test Roundup;

   c)  Not conducting sufficient testing programs to determine whether or not Roundup was safe for use; in that defendant herein knew or should have known that Roundup was unsafe and unfit for use by reason of the dangers to its users;

   d)  Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after defendant had knowledge that Roundup is, was, or could be carcinogenic;

   e)  Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the

25

carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

f)  Negligently failing to adequately and correctly warn the plaintiff, the medical and agricultural professionals, and the EPA of the dangers of Roundup;

g)  Negligently failing to petition the EPA to strengthen the warnings associated with Roundup;

h)  Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

i)  Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

j)  Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

k)  Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

l)  Negligently designing Roundup in a manner, which was dangerous to its users;

m)  Negligently manufacturing, producing, and formulating Roundup in a manner, which was dangerous to its users;

n)  Concealing information from the plaintiff while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations;

26

     o)  Improperly concealing and/or misrepresenting information from the plaintiff,
scientific and medical professionals, and/or the EPA, concerning the severity
of risks and dangers of Roundup compared to other forms of herbicides; and

     p)  Negligently selling Roundup with a false and misleading label.

135.     Defendant under-reported, underestimated and downplayed the serious dangers of
Roundup.

136.     Defendant negligently and deceptively compared the safety risks and/or dangers
of Roundup with common everyday foods such as table salt, and other forms of
herbicides.

137.     Defendant was negligent and/or violated Connecticut law in the designing,
researching, supplying, manufacturing, promoting, packaging, distributing, testing,
advertising, warning, marketing, and selling of Roundup in that they:

     a)  Failed to use ordinary care in designing and manufacturing Roundup so as to
avoid the aforementioned risks to individuals when Roundup was used as an
herbicide;

     b)  Failed to accompany their product with proper and/or accurate warnings
regarding all possible adverse side effects associated with the use of Roundup;

     c)  Failed to accompany their product with proper warnings regarding all possible
adverse side effects concerning the failure and/or malfunction of Roundup;

     d)  Failed to accompany their product with accurate warnings regarding the risks
of all possible adverse side effects concerning Roundup;

e) Failed to warn Plaintiff of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of NHL;

f) Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup;

g) Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants;

h) Negligently misrepresented the evidence of Roundup's genotoxicity and carcinogenicity; and

i) Were otherwise careless and/or negligent.

138.     Despite the fact that defendant knew or should have known that Roundup caused or could cause, unreasonably dangerous side effects, defendant continued to market, manufacture, distribute, and/or sell Roundup to consumers, including plaintiff.

139.     Defendant knew or should have known that consumers such as the plaintiff would foreseeably suffer injury as a result of defendant's failure to exercise ordinary care, as set forth above.

140.     Defendant's violations of law and/or negligence were the proximate cause of plaintiff's injuries, harm and economic loss, which plaintiff suffered and will continue to suffer.

141.     As a result of the foregoing acts and omissions, the plaintiff suffered from serious and dangerous side effects including, but not limited to, Non-Hodgkin's Lymphoma, as

28

well as other severe and personal injuries which are permanent and lasting in nature,

physical pain and mental anguish, diminished enjoyment of life, and financial expenses

for hospitalization and medical care. Further, plaintiff suffered life- threatening Non-

Hodgkin's Lymphoma, and severe personal injuries, which are permanent and lasting in

nature, physical pain and mental anguish, including diminished enjoyment of life.

## SECOND CAUSE OF ACTION
## (STRICT PRODUCTS LIABILITY – DESIGN DEFECT)

142.     Plaintiff repeats, reiterates and, re-alleges each and every allegation of this

Complaint contained in each of the foregoing paragraphs inclusive, with the same force

and effect as if more fully set forth herein.

143.     At all times herein mentioned, the defendant designed, researched, manufactured,

tested, advertised, promoted, sold, distributed, and/or have acquired the defendant who

have designed, researched, tested, advertised, promoted, marketed, sold, and distributed

Roundup as hereinabove described that was used by the plaintiff.

144.     Defendant's Roundup was expected to and did reach the usual consumers,

handlers, and persons coming into contact with said product without substantial change in

the condition in which it was produced, manufactured, sold, distributed, and marketed by

the Defendant.

145.     At those times, Roundup was in an unsafe, defective, and inherently dangerous

condition, which was dangerous to users, and in particular, the plaintiff herein.

146.     The Roundup designed, researched, manufactured, tested, advertised, promoted,

marketed, sold, and distributed by defendant was defective in design or formulation in

that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup.

147.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by defendant was defective in design and/or formulation, in that, when it left the hands of the defendant manufacturers and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

148.    At all times herein mentioned, Roundup was in a defective condition and unsafe, and defendants knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the defendant. In particular, defendant's Roundup was defective in the following ways:

   a)  When placed in the stream of commerce, defendant's Roundup products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate;

   b)  When placed in the stream of commerce, defendant's Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner;

   c)  When placed in the stream of commerce, defendants' Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner;

   d)  Defendant did not sufficiently test, investigate, or study its Roundup products;

e) Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide;

f) Defendant knew or should have known at the time of marketing its Roundup products that exposure to Roundup and could result in cancer and other severe illnesses and injuries; and

g) Defendant did not conduct adequate post-marketing surveillance of its Roundup products.

149.    Defendants knew or should have known that at all times herein mentioned its Roundup was in a defective condition and was and is inherently dangerous and unsafe.

150.    Plaintiff was exposed to defendants' Roundup, as described above, without knowledge of Roundup's dangerous characteristics.

151.    At the time of the plaintiff's use of and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad- spectrum herbicide.

152.    Defendant with this knowledge voluntarily designed its Roundup with a dangerous condition for use by the public, and in particular the plaintiff.

153.    Defendant had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

154.    Defendant created a product that was and is unreasonably dangerous for its normal, intended use.

155.    Defendant marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

156.     The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by defendant was manufactured defectively in that Roundup left the hands of defendant in a defective condition and was unreasonably dangerous to its intended users.

157.     The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by defendant reached their intended users in the same defective and unreasonably dangerous condition in which the defendant's Roundup was manufactured.

158.     Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to the plaintiff in particular, and defendant is therefore strictly liable for the injuries sustained by the plaintiff.

159.     The plaintiff could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or perceived its danger.

160.     By reason of the foregoing, the defendant has become strictly liable to the plaintiff for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup.

161.     Defendant's defective design, of Roundup amounts to willful, wanton, and/or reckless conduct by defendant.

162.     Defects in Defendant's Roundup were the cause or a substantial factor in causing Plaintiff's injuries.

163.     As a result of the foregoing acts and omission, the plaintiff developed Non-

Hodgkin's Lymphoma, and suffered severe and personal injuries, which are permanent

and lasting in nature, physical pain and mental anguish, including diminished enjoyment

of life, and financial expenses for hospitalization and medical care.

**THIRD CAUSE OF ACTION**
**(STRICT PRODUCTS LIABILITY – FAILURE TO WARN)**

164.     Plaintiff repeats, reiterates and re-alleges each and every allegation of this

Complaint contained in each of the foregoing paragraphs inclusive, with the same force

and effect as if more fully set forth herein.

165.     Defendant has engaged in the business of selling, testing, distributing, supplying,

manufacturing, marketing, and/or promoting Roundup, and through that conduct have

knowingly and intentionally placed Roundup into the stream of commerce with full

knowledge that it reaches consumers such as plaintiff who are exposed to it through

ordinary and reasonably foreseeable uses.

166.     Defendant did in fact sell, distribute, supply, manufacture, and/or promote

Roundup to Plaintiff. Additionally, defendant expected the Roundup that they were

selling, distributing, supplying, manufacturing, and/or promoting to reach – and Roundup

did in fact reach – consumers, including plaintiff, without any substantial change in the

condition of the product from when it was initially distributed by defendant.

167.     At the time of manufacture, defendant could have provided the warnings or

instructions regarding the full and complete risks of Roundup and glyphosate- containing

products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

168.    At all times herein mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user and was so at the time it was distributed by defendant and at the time plaintiff was exposed to the product. The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to, developing Non-Hodgkin's Lymphoma as a result of exposure and use.

169.    Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect the health of those exposed in violation of 7 U.S.C. § 136j(a)(1)(E).

170.    Defendant's failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. § 136j(a)(1)(E) as well as the laws of the State of Connecticut.

171.    Defendant could have amended the label of Roundup to provide additional warnings.

172.    This defect caused serious injury to plaintiff, who used Roundup in its intended and foreseeable manner.

173.    At all times herein mentioned, defendant had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

174.     Defendant labeled, distributed, and promoted the aforesaid product that it was dangerous and unsafe for the use and purpose for which it was intended.

175.     Defendant failed to warn of the nature and scope of the side effects associated with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of Chronic Lymphocytic Leukemia and Non-Hodgkin's Lymphoma.

176.     Defendant was aware of the probable consequences of the aforesaid conduct. Despite the fact that defendant knew or should have known that Roundup caused serious injuries, defendant failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effect of developing Non-Hodgkin's Lymphoma from Roundup exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution. Defendant willfully and deliberately failed to avoid the consequences associated with their failure to warn, and in doing so, Defendants acted with a conscious disregard for the safety of plaintiff.

177.     At the time of exposure, plaintiff could not have reasonably discovered any defect in Roundup prior through the exercise of reasonable care.

178.     Defendant, as the manufacturers and/or distributors of the subject product, are held to the level of knowledge of an expert in the field.

179.     Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of Defendant.

180.    Had defendant properly disclosed the risks associated with Roundup products, plaintiff would have avoided the risk of Non-Hodgkin's Lymphoma by not using Roundup products.

181.    The information that defendant did provide or communicate failed to contain adequate warnings and precautions that would have enabled plaintiff, and similarly situated individuals, to utilize the product safely and with adequate protection. Instead, defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

182.    To this day, defendant has failed to adequately warn of the true risks of plaintiff's injuries associated with the use of and exposure to Roundup.

183.    As a result of its inadequate warnings, defendant's Roundup products were defective and unreasonably dangerous when they left the possession and/or control of defendant, were distributed by defendant, and used by plaintiff.

184.    As a direct and proximate result of defendant's actions as alleged herein, and in such other ways to be later shown, the subject product caused plaintiff to sustain injuries as herein alleged.

## FOURTH CAUSE OF ACTION
## (BREACH OF IMPLIED WARRANTIES)

185.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of this
Complaint contained in each of the foregoing paragraphs inclusive, with the same force
and effect all if more fully set forth herein.

186.    At all times herein mentioned, the defendant manufactured, distributed,
compounded, recommended, merchandized, advertised, promoted, and sold Roundup
and/or have recently acquired the defendant who have manufactured, compound
portrayed, distributed, recommended, merchandized, advertised, promoted, and sold
Roundup, as a broad spectrum herbicide. These actions were under the ultimate control
and supervision of defendant.

187.    At the time defendant marketed, sold, and distributed Roundup for use by
plaintiff, defendant knew of Roundup's intended use and impliedly warranted the product
to be or merchantable quality and safe and fit for this use.

188.    The defendant impliedly represented and warranted to plaintiff and users of
Roundup, the agricultural community, and/or the EPA that Roundup was safe and of
merchantable quality and fit for the ordinary purpose for which it was to be used.

189.    These representations and warranties were false, misleading, and inaccurate in
that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, and
defective.

190.    Plaintiff and/or the EPA did rely on said implied warranty of merchantability of
fitness for particular use and purpose.

37

191.     Plaintiff reasonably relied upon the skill and judgment of defendant as to whether

Roundup was of merchantable quality and safe and fit for its intended use.

192.     Roundup was injected into the stream of commerce by the defendant in a

defective, unsafe, and inherently dangerous condition, and the products' materials were

expected to and did reach users, handlers, and persons coming into contact with said

products without substantial change in the condition in which they were sold.

193.     The defendant breached the aforesaid implied warranties, as their herbicide

Roundup was not fit for its intended purposes and uses.

194.     As a result of the foregoing acts and omissions, plaintiff suffered from Non-

Hodgkin's Lymphoma and plaintiff suffered severe and personal injuries which are

permanent and lasting in nature, physical pain and mental anguish, including diminished

enjoyment of life, financial expenses for hospitalization and medical care, including

medical expenses and other economic, and non-economic damages.

## PRAYER FOR RELIEF

Wherefore, the Plaintiff demands judgement against the Defendant on each of the above-referenced claims and causes of action as follows:

1. Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

2. Awarding compensatory damages to Plaintiff for past and future damages, including, but not limited to, Plaintiff pain and suffering and for severe and permanent personal injuries sustained by the Plaintiff including health care costs and economic loss;

3. Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determine at trial of this action;

4. Punitive and/or exemplary damages for the wanton, willful, fraudulent, and reckless acts of the Defendant who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiff's decedent in an amount sufficient to punish Defendant and deter future similar conduct, to the extent allowed by applicable law;

5. Pre-judgment interest;

6. Post-judgment interest;

7. Awarding Plaintiff reasonable attorneys' fees;

8. Awarding Plaintiff the costs of these proceedings; and

9. Such other and further relief as this Court deems just and proper.

39

The Plaintiff hereby demands a trial by jury of all claims asserted in her Complaint.

Dated: June 1, 2022                    Respectfully Submitted,

                                       By: /s/ Trevor J. Doyon
                                       Trevor J. Doyon Bar No.: Ct30859
                                       Wiley Etter Doyon, LLC
                                       97 Washington Ave, Suite 2
                                       North Haven, CT 06473
                                       203-446-4725
                                       203-889-0193 (fax)
                                       Trevor@wileylegal.com